Filed 12/17/13  Smith v. City of San Jose CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| TED SMITH,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN JOSE et al.,<br><br>    Defendants and Respondents. | H037626<br>(Santa Clara County<br>Super. Ct. No. CV089167) |

Appellant Ted Smith raises facial challenges to the constitutionality of several San Jose Municipal Code (SJMC) ordinances regulating and defining expenditure lobbyists and in-house lobbyists, and a SJMC ordinance prohibiting lobbyists from intentionally deceiving or attempting to deceive city officials about pending legislative or administrative actions.  Respondents are the City of San Jose and the San Jose Elections Commission.[1]  Smith filed a taxpayer suit over the ordinances in question, alleging that they infringe upon the constitutional right to free speech, are overbroad, and are unduly vague.  The trial court below denied Smith's motion for summary judgment and granted the City's motion for summary judgment in part, after finding that the expenditure lobbyist ordinance, in-house lobbyist ordinance, and anti-deceit ordinance all passed constitutional muster.  Smith appeals.

We conclude that the City's expenditure lobbyist, in-house lobbyist, and anti-deceit ordinance are not facially unconstitutional.  We affirm the judgment.

---

[1] We will collectively refer to the respondents as "City" for clarity.

FACTUAL BACKGROUND

*Smith's Standing*

Smith is a taxpayer and property owner who resides in the City of San Jose. On appeal, Smith challenges three of the City's ordinances: (1) the definition and regulation of "expenditure lobbyist" (SJMC, § 12.12.180C), (2) the definition and regulation of "in-house lobbyist" (*id.*, B), and (3) the City's anti-deceit ordinance prohibiting individuals from intentionally deceiving a public official about pending administrative or legislative activity (*id.*, § 12.12.500C). Smith filed a lawsuit, authorized under Code of Civil Procedure section 526a, challenging the ordinances.[2]

*Lobbyist Registration and Requirements*

Lobbyists working within the City are subject to certain rules and requirements, as outlined in SJMC section 12.12.400 et seq. Under the SJMC, the term "lobbyist" includes those individuals that fall within the definition of an expenditure lobbyist, an in-house lobbyist, or a contract lobbyist under the municipal code. All lobbyists must register with the city clerk no later than 10 days after meeting the definition of a lobbyist under the SJMC. (SJMC, § 12.12.400A.) Registration includes submission of a threshold report. For in-house lobbyists and expenditure lobbyists, this registration report

---

[2] "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the State, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein. This section does not affect any right of action in favor of a county, city, town, or city and county, or any public officer; provided, that no injunction shall be granted restraining the offering for sale, sale, or issuance of any municipal bonds for public improvements or public utilities. [¶] An action brought pursuant to this section to enjoin a public improvement project shall take special precedence over all civil matters on the calendar of the court except those matters to which equal precedence on the calendar is granted by law." (Code Civ. Proc., § 526a.)

includes the requirement that they provide "[a] brief description of the legislative or administrative action(s) the lobbyist seeks to influence." (*Id*., §§ 12.12.410C, ¶ 2, 12.12.410D, ¶ 2.) Lobbyists are required to renew their registration each year. (*Id*., § 12.12.400A, B.) In addition to this registration requirement, lobbyists must also submit quarterly reports to the city clerk. (*Id*., § 12.12.430A.) Registration and renewal of registration are accompanied with mandatory fees. (*Id*., § 12.12.440A, B.) As amended in 2005, the current registration fee for lobbyists is $350. (*Id*., § 12.12.440.)

According to the SJMC, the city attorney may investigate alleged violations of the lobbyist ordinances. (SJMC, § 12.12.610A.) If an individual does not comply with the mandates of registration, the city clerk may issue an order to show cause at the request of any city official. (*Id*., § 12.12.620A.) The order to show cause will specify a time and place for the individual to appear before the elections commission to demonstrate that he or she has either complied with registration or is exempt from registration. (*Id*., § 12.12.620B.) Violations of the lobbyist ordinances may result in civil penalties of up to $5,000. (*Id*., § 12.12.630.)

Not all individuals are subject to the registration requirements under the SJMC. Section 12.12.020 of the SJMC provides a list of exemptions. Those exempted include: (1) a public official acting in his or her public capacity, (2) individuals solely engaged in publication of news periodicals or editorials that directly or indirectly encourage government action, (3) individuals preparing documents under the California Environmental Quality Act of 1970 or those persons hired by the City to perform work for the City, (4) business owners whose attempts to influence the government are on behalf of their business and who has not made or solicited contributions for the contacted official in excess of $1,000 in the last 12 months, who has not retained an individual to engage in lobbying activities on the business' behalf, and whose employees are not

3

actively engaged in lobbying activities on behalf of the business or the owner,[3] (5) those whose attempts to influence government action are limited to publicly appearing at public meetings and other public proceedings and preparing, processing, or submitting documents or writings for use in public meetings or other public proceedings, (6) individuals meeting with city officials to report mismanagement or government waste, (7) those meeting with the city attorney to discuss any claim or litigation matter where the City is a party, (8) uncompensated members of the board of directors of nonprofit organizations, (9) members of neighborhood associations, (10) those whose communications are solely related to collective bargaining agreements between the City and a recognized employee organization or proceedings before the City of San Jose Civil Service Commission, (11) those solely communicating about an existing contract between themselves and the City, or (12) compensated officers or employees of a nonprofit organization whose attempts to solicit government action are on behalf of the organization. (SJMC, § 12.12.020.)

### *The Expenditure Lobbyist Definition*

As defined by the SJMC, an expenditure lobbyist is "[a] person who makes payments or incurs expenditures in the aggregate amount of five thousand dollars ($5,000.00) or more during any calendar year in connection with carrying out public relations, advertising or similar activities with the intent of soliciting or urging, directly or indirectly, other persons to communicate directly with any City Official in order to attempt to influence a legislative or administrative action. The five thousand dollars ($5,000.00) threshold does not include: [¶] 1. Compensation paid to Contract Lobbyists

---

[3] The business owner exemption applies only to registration as an in-house lobbyist. Business owners meeting the qualifications of this exemption, but who meet the qualifications for either an expenditure lobbyist or contract lobbyist, must still register as a lobbyist. (SJMC, § 12.12.020D.)

4

or In-House Lobbyists for lobbying activity; or [¶] 2. Dues, donations, or other economic consideration paid to an organization, regardless of whether the dues, donations or other economic consideration are used in whole or in part for lobbying activity." (SJMC, § 12.12.180C.)

Expenditure lobbyists must provide registration information which includes the names of all owners, officers and employees conducting lobbying activities, as well as a brief description of the legislative or administrative actions the lobbyist seeks to influence.[4] (SJMC, § 12.12.410D.) SJMC section 12.12.170 provides a definition as to what constitutes lobbying activity: "influencing or attempting to influence a City Official or City Official-Elect with regard to a legislative or administrative action of the City or Redevelopment Agency." For the purposes of the section, "influencing" is further defined as "contacting, either directly or indirectly, for the purpose of promoting, supporting, modifying, opposing, causing the delay or abandonment of conduct, or otherwise intentionally affecting the official actions of the City Official or City Official-Elect, by any means, including, but not limited to providing, preparing, processing, or submitting information, incentives, statistics, studies or analyses." (*Id*., § 12.12.170A.)

### The In-House Lobbyist Definition

The SJMC defines an in-house lobbyist as: "Any person, including a business, corporation, association, political action committee, or any other organization if its owners, officers, or employees have engaged in lobbying activity on its behalf and whose aggregate time engaging in lobbying activity total [*sic*] ten (10) hours or more in a consecutive twelve (12) month period." (SJMC, § 12.12.180B.)

---

[4] Section 12.12.170 of the SJMC also provides a definition for what constitutes "legislative action" or "administrative action" under the code. (SJMC, § 12.12.170B-C.)

5

SJMC section 12.12.410C provides some clarity as to what constitutes an in-house lobbyist, as it requires that in-house lobbyist registration reports must provide information including (1) names of each owner, officer, and employee conducting lobbying activities on the in-house lobbyist's behalf and (2) a brief description of the legislative or administrative action(s) the lobbyist seeks to influence.

The same definitions discussed in SJMC section 12.12.170 regarding what constitutes "lobbying activity" and "influencing" is applicable to the in-house lobbyist ordinances.

### *The Anti-Deceit Ordinance*

Smith also challenges the constitutionality of the City's ban against deceit of city officials. The City's anti-deceit ordinance states that no person engaged in a lobbying activity may "[i]ntentionally deceive or attempt to deceive a City Official as to any material fact which is pertinent to any pending or proposed legislative or administrative action." (SJMC, § 12.12.500C.) As noted earlier, the SJMC provides a definition for what constitutes "legislative action" or "administrative action." (*Id*., § 12.12.170B-C.) "Legislative action" means "the drafting, introduction, consideration, modification, enactment or defeat of any resolution, ordinance, amendment thereto, report, nomination or other action of the Mayor, City Council, Redevelopment Agency of the City, or City board or commission, or task force or any joint powers authority of which the City is a party." (*Id*., § 12.12.170B.) "Administrative action" means "the proposal, drafting, development, consideration, advocacy, recommendation, adoption, amendment or approval of any rule, regulation, agreement, contract, permit, license or hiring action." (*Id*., § 12.12.170C.)

**PROCEDURAL HISTORY**

Smith filed his initial complaint for declaratory and injunctive relief and to restrain illegal expenditure of public money on July 3, 2007. Smith filed a first amended

6

complaint on October 4, 2007. The first amended complaint alleged constitutional deficiencies with the City's ordinances regulating and defining lobbyists and campaign expenditures, including the ordinances defining and regulating in-house lobbyists and expenditure lobbyists, and barring deceit of city officials.

Smith filed a motion for summary judgment, or in the alternative, summary adjudication, on all of his claims on February 16, 2010. The City filed its own motion for summary judgment, or in the alternative, summary adjudication, on all of Smith's claims on the same date.

The trial court issued an order on the parties' respective motions for summary judgment on March 4, 2011, granting the City's motion in part and denying Smith's motion with respect to Smith's challenges to the definition and regulation of expenditure lobbyists, in-house lobbyists, and the anti-deceit ordinance.[5] After a bench trial on the remaining disputed issue with regard to the constitutionality of the City's late campaign contribution ordinance, the trial court entered a final judgment on October 7, 2011, disposing of all issues and finding the late campaign contribution ordinance unconstitutional. Smith filed a timely notice of appeal over the judgment on November 17, 2011.

## STANDARD OF REVIEW

Smith challenges the constitutionality of the City's municipal ordinances defining and regulating expenditure lobbyists and in-house lobbyists, and the regulation prohibiting deceit of a city official by those engaged in lobbying activity, as they are written. These facial challenges to the constitutionality of the ordinances are reviewed

---

[5] The trial court made several other determinations in its order that are unrelated to this current appeal. It found that several of Smith's challenges were moot, and further found that a factual dispute existed with regard to Smith's challenge to the City's ordinance on campaign contribution periods. Therefore, the trial court denied summary adjudication with respect to Smith's challenge to campaign contribution periods.

under a de novo standard of review.  (*Griffith v. City of Santa Cruz* (2012) 207 Cal.App.4th 982, 990.)  Furthermore, we review the trial court's denial and grant of summary judgment under a de novo standard of review.  (*Monticello Ins. Co. v. Essex Ins. Co.* (2008) 162 Cal.App.4th 1376, 1385.)

DISCUSSION

Smith raises several arguments on appeal.  First, he claims that the expenditure lobbyist and in-house lobbyist ordinances are content- and speaker-based restrictions on speech that violate the United States Constitution and the California Constitution and are therefore subject to strict scrutiny.  Second, Smith argues that even if this court were to find that the correct standard of scrutiny is exacting scrutiny, not strict scrutiny, the expenditure lobbyist ordinance is still unconstitutional under the more lenient standard.  Third, Smith contends that the in-house lobbyist ordinance is similarly unconstitutional and is vague and overbroad.  Lastly, Smith argues that the City's anti-deceit ordinance is unconstitutionally vague.  We understand Smith to be launching a facial challenge to the constitutionality of the ordinances in question, as he has not challenged the validity of the ordinances as applied to him.[6]  We address each of Smith's facial challenges in turn.

I.　　*Expenditure Lobbyist Ordinance and Free Speech*

Smith's first argument is that the City ordinances regulating and defining expenditure lobbyists and in-house lobbyists must be subject to strict scrutiny review because the ordinances function as content- and speaker-based restrictions on free speech. (U.S. Const., 1st Amend.; Cal. Const. art. I, §§ 2-3.)  Preliminarily, we determine that we

---

[6] In the trial court proceedings below, Smith at one point alleged that he was launching a facial challenge to the constitutionality of the ordinances as well as an as-applied challenge.  We do not understand Smith to be advancing an as-applied challenge on appeal.

8

must review the expenditure lobbyist ordinance under an exacting scrutiny standard of review, contrary to Smith's claims.

A. ***Exacting Scrutiny is Applicable to Disclosure and Registration Requirements***

Not all restrictions on speech are subject to the strict scrutiny standard. The California Supreme Court has held that when the challenged regulation "merely has an incidental effect on exercise of protected rights, strict scrutiny is not applied." (*Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 47 (*FPPC*).) However, strict scrutiny will be applied if there is a significant interference or "appreciable impact" on the exercise of an individual's fundamental right. (*Ibid*.) We find the exacting scrutiny standard of review, as set forth in *FPPC*, applicable in this particular case.

In *FPPC*, the California Supreme Court contemplated the constitutionality of regulations governing lobbyists codified in the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.). (*FPPC*, *supra*, 25 Cal.3d at p. 37.) Under the Political Reform Act, lobbyists were required to register and report all payments for lobbying activities. (*Id*. at p. 46.) Lobbyists were also required to report any transactions of $500 or more in a single year with a business entity that the lobbyist knows or has reason to know that any state candidate, or legislative agency, or elective official, is an owner, director, partner, officer, or manager or has more than a 50 percent interest. (*Ibid*.) Advocates against these regulations argued that since speech and petition rights were implicated, the court must apply strict scrutiny. (*Ibid*.) The court agreed in part, but disagreed in part.

With respect to the registration and reporting requirements, the Supreme Court found that these provisions were not "direct limitations on the right to petition for redress of grievances." (*FPPC*, *supra*, 25 Cal.3d at p. 47.) The court reasoned that the burden created by registration and reporting did not substantially interfere with the lobbyist's ability to "raise his voice," and that "[w]hile the burden of disclosure might be substantial for those engaging in extensive lobbying activities, the burden is not great when viewed

9

in the context of the total activities engaged in." (*Ibid*.)  Furthermore, the court found that "the burden placed on employers of lobbyists to disclose their expenditures for lobbying purposes, and the action thereby sought to be influenced, does not constitute a substantial interference with the exercise of petition and speech rights." (*Id*. at p. 48.) The Court further drew a distinction that requiring an individual engaged in a business, such as lobbying, to describe it and to report its receipts and expenses, cannot be "viewed in our commercial society as a substantial impediment to engaging in that business." (*Id*. at pp. 47-48.)

However, with respect to the transaction reporting requirements at issue, the court found that strict scrutiny was applicable. (*FPPC*, *supra*, 25 Cal.3d at pp. 48-49.)  The transaction reporting requirement contemplated in *FPPC* required lobbyists to report transactions totaling $500 or more in a single year with business entities of which the lobbyist knows or has reason to know that any state candidate, or legislative, agency, or elective official is a proprietor, partner, director, officer or manager or has more than a 50 percent interest. (*Id*. at p. 48.)  The court considered the transaction reporting requirements to be so "onerous as to constitute a significant interference with the fundamental right to petition," as the extent of transaction reporting would not be directly tied to the extent of lobbying activity. (*Ibid*.)

For example, the extent of reporting would be tied to the lobbyist's transactions with a business entity that may not have anything to do with lobbying activity at all. (*FPPC*, *supra*, 25 Cal.3d at p. 48.)  The court reasoned that the reporting requirement would mean that "if a director of the Bank of America is also an agency official--perhaps a Regent of the University of California--a lobbyist and any person who employs a lobbyist or spends more than $250 in a single month to influence legislative or administrative action must disclose transactions above the statutory amount with the Bank of America.  The requirement applies even though the lobbying activities have

10

nothing to do with the university or banks." (*Ibid*.) The court thereafter found that the transaction reporting requirement failed to survive strict scrutiny review because the "right to petition for redress of grievances . . . may not be conditioned upon disclosure of irrelevant private financial matters unrelated to the petition activity." (*Id*. at p. 49.)

The application of the less stringent exacting scrutiny review has also been applied by the United States Supreme Court with regard to disclaimer and disclosure requirements. The United States Supreme Court has found that these requirements " ' impose no ceiling on campaign-related activities,' [citation], and 'do not prevent anyone from speaking.' " (*Citizens United v. Federal Election Com'n* (2010) 558 U.S. 310, 366 (*Citizens United*).) " '[E]xacting scrutiny,' " as defined by the *Citizens United* court, requires a substantial relationship between the disclosure requirement and a " 'sufficiently important' " governmental interest. (*Id*. at pp. 366-367.)

We find that under the existing precedent set forth by the California Supreme Court and the United States Supreme Court, we must apply an exacting scrutiny standard of review to the sections of the SJMC that Smith challenges. Smith's argument that strict scrutiny applies is unavailing. It is true that laws restricting political speech are often subject to a strict scrutiny standard of review, as articulated by the United States Supreme Court in *Citizens United*. (See *Citizens United*, *supra*, 558 U.S. at pp. 336-338.) In *Citizens United*, the court utilized a strict scrutiny standard of review when determining the constitutionality of United States Code section 441b which made it a felony for corporations to either expressly advocate the election or defeat of candidates or to broadcast "electioneering communications" within 30 days of a primary election and 60 days of a general election. (*Citizens United*, *supra*, at p. 337.) Other laws subject to strict scrutiny have included a law requiring a permit at the outset, a law impounding proceeds on receipts or royalties, and a law seeking to exact a cost after the speech occurs. (*Id*. at pp. 336-337.) In *FPPC*, the California Supreme Court applied strict

11

scrutiny review only to the transaction reporting requirement at issue, as that requirement was not tied to a lobbyist's lobbying activity. (*FPPC*, *supra*, 25 Cal.3d at pp. 48-49.)

Here, the disclosure and registration requirements imposed upon in-house lobbyists and expenditure lobbyists in the challenged SJMC ordinances do not prevent an individual from exercising his right to petition or to speak. (See *Doe v. Reed* (2010) 130 S.Ct. 2811, 2818 [2010 U.S. LEXIS 5256] [finding that requirement of Washington's Public Records Act, requiring disclosure of information regarding signatories of referendum petitions subject to exacting scrutiny review] (*Doe*).) Furthermore, the disclosure requirements are tied to the extent and amount of petitioning activity undertaken by an in-house lobbyist or expenditure lobbyist. The SJMC ordinances in question create a burden, but this burden in no way acts as a prohibition. Individuals seeking to influence city actions may certainly spend more than the $5,000, the threshold registration requirement, on lobbying activity. Furthermore, Smith's attempt to draw a distinction that the SJMC ordinances are speaker-based, as the ordinances provide exemptions from disclosure for certain individuals and entities such as news reporters and nonprofit organizations, is similarly unavailing. The regulations challenged in *FPCC*, *supra*, 25 Cal.3d 33, required only *lobbyists*, not other members of the public, to report expenditures and disclose information about their lobbying activity. (*Id*. at p. 46.) The California Supreme Court found strict scrutiny inapplicable in *FPCC*. (*Id*. at p. 47.) We therefore apply an exacting scrutiny standard of review to the challenged ordinances, and determine whether the ordinances bear a substantial relationship to a sufficiently important government interest.

B. *The Expenditure Lobbyist Ordinance Survives Exacting Scrutiny*

SJMC section 12.12.180C defines an expenditure lobbyist as any individual that spends more than $5,000 in a year to intentionally solicit or urge, directly or indirectly, other persons to communicate directly with any city official in order to attempt to

12

influence a legislative or administrative action.  Smith argues that the ordinance is unconstitutional on the ground that it fails to survive exacting scrutiny.  We disagree, as the disclosure and registration requirements bear a substantial relationship to a sufficiently important government interest.  (*Human Life of Washington Inc. v. Brumsickle* (9th Cir. 2010) 624 F.3d 990, 1008 (*Human Life of Washington*).)

### 1. *Vital Governmental Interest*

The first step of our exacting scrutiny review is to determine whether there is a vital government interest in the registration and disclosure of information regarding expenditure lobbyists.  We find that there is.

The United States Supreme Court, in *United States v. Harriss* (1954) 347 U.S. 612 (*Harriss*), recognized that Congress possesses a valid interest in determining who seeks to influence legislation, and therefore found no error with the Federal Regulation of Lobbying Act and its requirement that lobbyists report their lobbying receipts and expenditures.  (*Id.* at pp. 625-626.)  The Supreme Court reasoned that "legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected.  Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures."  (*Id.* at p. 625.)  The California Supreme Court has also recognized the existence of this important government interest in *FPPC*, where the court acknowledged that the *Harriss* court found that "Congress has a valid interest in determining the source of voices seeking to influence legislation and could reasonably require the professional lobbyist to identify himself and disclose his lobbying activities," (*FPPC*, *supra*, 25 Cal.3d at p. 47) and that the court itself had in previous cases "upheld reasonable statutes requiring disclosure of financial activities of persons engaged in political processes."  (*Ibid.*)

13

There are several United States Supreme Court cases recognizing a vital government interest in providing the electorate with information so that it may make an informed decision amongst candidates for offices. (*Buckley v. Valeo* (2003) 424 U.S. 1 (*Buckley*), superseded by statute on other grounds as stated in *McConnell v. Federal Election Com'n* (2003) 540 U.S. 93.) For example, in *Citizens United*, the United States Supreme Court recognized that the First Amendment serves to protect political speech. The Supreme Court reasoned that disclosure placed a burden on certain political speech, but that there was a government interest in ensuring that citizens and shareholders of corporations can "react to the speech of corporate entities in a proper way." (*Citizens United*, *supra*, 558 U.S. at p. 371.)

To this end, we conclude that there is a vital government interest in providing disclosure both to lawmakers and to the public of individuals who seek to influence legislation through expenditure of money. The vital governmental interest here is the same as the one contemplated in *Harriss* and *FPPC*, and similar to the interest discussed by the court in *Citizens United*. Transparency in the electoral process, and the dissemination of information to decisionmakers has long been recognized and acknowledged by both the United States Supreme Court and the California Supreme Court as important governmental interests. Similarly here, there is a vital government interest in providing information to the public about those who seek to influence local government action through lobbying activity. We see no difference between a government interest in providing transparency with respect to federal or state officials and a government interest in providing transparency to city officials and local lawmakers.

Smith attempts to distinguish the SJMC ordinances by pointing out that the expenditure lobbyist ordinance, unlike the lobbyist disclosure and registration requirements contemplated in *Harriss* and *FPPC*, covers individuals who are not professional, paid lobbyists. The City contends that this argument is fatally flawed, in

14

part because the lobbyist regulations contemplated in *FPPC* were not entirely restricted to professional lobbyists. One of the regulations challenged in *FPPC* mandated that "[p]ersons who employ a lobbyist *or pay $250 in any month* to influence legislative or administrative action must also file reports. Among other matters, the reports must disclose businesses engaged in, the total amount of payments to influence legislative or administrative action, any contributions made, the names of persons who received $25 or more, and a specific description of legislative or administrative action sought to be influenced." (*FPPC*, *supra*, 25 Cal.3d at p. 46, italics added.) This regulation was ultimately found to be constitutionally valid and supported by a sufficiently important governmental interest. (*Id*. at p. 48.)

In *Harriss*, the United States Supreme Court reviewed the constitutionality of portions of the Federal Regulation of Lobbying Act, which provided that " '[e]very person receiving any contributions or expending any money for the purposes designated' " in another portion of the Act to file a statement containing certain information, including the sum of expenditures and contributions made and information on the recipients of the expenditures and contributions. (*Harriss*, *supra*, 347 U.S. at p. 614, fn. 1.) Nonetheless, these requirements, as specified in a separate section of the Act, were made applicable only to those persons who " 'by himself, or through any agent or employee or other persons in any manner whatsoever, directly or indirectly, solicits, collects, or receives money or any other thing of value to be used principally to aid, or the principal purpose of which person is to aid, in the accomplishment of any of the following purposes: [¶] '(a) The passage or defeat of any legislation by the Congress of the United States. [¶] '(b) To influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States.' " (*Id*. at pp. 618-619.) In short, "the solicitation, collection, or receipt of money or other thing of value is a prerequisite to coverage under the Act." (*Id*. at p. 619.)

15

Smith is correct that the regulations contemplated in *Harriss* applied only to lobbyists receiving compensation for their lobbying activity. However, the same cannot be said for the regulation contemplated in *FPPC*. In fact, the definition of an expenditure lobbyist under the SJMC is quite similar to the regulation at issue in *FPPC*. Under the regulation analyzed in *FPPC*, any person who paid more than $250 in any month to influence legislation is required to file monthly reports. The SJMC ordinance governing expenditure lobbyists, as described *ante*, requires registration for any individual who spends more than $5,000 in a year with the intent to influence others, either directly or indirectly, to contact city officials to influence legislation. These individuals must indicate what legislative or administrative action they seek to influence.

Furthermore, we agree with the trial court's assessment of the issue in that we fail to see how there is a clear delineation between the government's interest in disclosure of financial contributions and lobbying activity from *paid* lobbyists and the financial contributions and lobbying activity from *unpaid* lobbyists. The government interest in providing transparency and information to the public and other decisionmaking bodies remains the same for both types of lobbying activity.[7]

Smith argues that the ordinance "apparently requires expenditure lobbyists to register even if others contact City officials for reasons and on topics other than those urged by the expenditure lobbyist," and that therefore the reporting requirement "may not bear any relation at all to communications that reach City officials." Smith therefore likens the expenditure lobbyist ordinance to the transaction reporting requirement deemed unconstitutional in *FPPC*. We disagree with Smith's assessment of the ordinance. The

---

[7] The Blue Ribbon Task Force, created by the City to consider options that could lead to greater transparency and accountability in public decisionmaking, developed proposed amendments to the City's lobbyist ordinances and recommended them to the city council.

16

ordinance requires an expenditure lobbyist to register if the lobbyist spends $5,000 or more in a calendar year on public relations or advertising with the intent to solicit or urge others to communicate directly with any city official in an effort to influence legislative or administrative actions. (SJMC, § 12.12.180C.) As stated in the ordinance itself, the registration requirement is directly linked to lobbying efforts. Registration is not contingent upon individuals contacting city officials. Rather, registration and disclosure are contingent on the *amount* of expenses incurred by the expenditure lobbyist on lobbying activity. The registration and disclosure requirements are tied to an expenditure lobbyist's lobbying efforts, unlike the transaction reporting requirement in *FPPC*.

However, the existence of a vital government interest in disclosure does not necessarily render the definition and regulation of expenditure lobbyists constitutional. In order to survive exacting scrutiny, the ordinances must be sufficiently related to this important interest.

### 2. *The Expenditure Lobbyist Ordinance is Sufficiently Related*

Smith argues that the expenditure lobbyist ordinance is not sufficiently related to the governmental interest in disclosure in two ways. He contends that the definition of expenditure lobbyist is underinclusive and overinclusive. This paradoxical argument arises from the way the definition of "expenditure lobbyist" explicitly excludes certain individuals from the registration requirement, such as heads of nonprofit organizations, but includes, as a general rule, any *other* individual that meets the ordinance's expenditure threshold of $5,000. The validity of the statute rests on whether this definition is sufficiently related to the government's interest in disclosure. We find that it is.

As previously described, state and federal courts have acknowledged the existence of an important government interest in public disclosure of lobbyists and those who spend money to influence legislation. (See *Harriss*, *supra*, 347 U.S. at pp. 625-626;

17

*FPPC*, *supra*, 25 Cal.3d at p. 47.)  However, this interest is different from the disclosure required by the expenditure lobbyist ordinance, as the ordinance mandates disclosure and registration if an individual spends $5,000 per year "in connection with carrying out public relations, advertising or similar activities with the intent of soliciting or urging, directly or indirectly, other persons to communicate directly with any City Official in order to attempt to influence a legislative or administrative action."  (SJMC, § 12.12.180C.)

As the United States Supreme Court has held, in order to determine whether governmental interests are sufficient in order to justify restrictions, we must consider the extent of the burden placed on First Amendment rights.  (*Buckley*, *supra*, 424 U.S. at p. 68.)  Here, it appears any burden would be minimal.  There are no restrictions placed on the amount of lobbying an expenditure lobbyist may engage in, and there are no rules on how much a lobbyist may spend.  As our Supreme Court explained in *FPPC*, the registration, reporting, and disclosure of receipts imposed on lobbyists "does not substantially interfere with the ability of the lobbyist to raise his voice.  While the burden of disclosure might be substantial for those engaging in extensive lobbying activities, the burden is not great when viewed in the context of the total activities engaged in." (*FPPC*, *supra*, 25 Cal.3d at p. 47.)

Similarly, here the burden that would be imposed on those engaged in extensive lobbying activities would be greater, but such a burden would be proportionate to the total amount of lobbying activity an expenditure lobbyist seeks to partake.  Furthermore, the SJMC itself provides for certain exemptions.  Exemptions apply to those who are purely engaged in "publication or broadcasting of news items, editorials, or commentary which directly or indirectly urges governmental action," (SJMC, § 12.12.020B) and to those whose attempts to influence governmental action are limited to "[p]ublicly appearing at a public meeting, public hearing, or other official proceeding open to the

18

public" (*id*., ¶ 1) and or "[p]reparing, processing, or submitting documents or writings in connection with the governmental action for use at a public meeting, public hearing, or other official proceeding open to the public." (*Id*., ¶ 2.) Individuals who choose to urge governmental action by spending money printing leaflets or appearing at public hearings would be exempt from the disclosure requirements set forth in the expenditure lobbyist ordinance. So would those individuals who decide to publish opinion pieces or broadcast their views through other forms of media on topics relevant to pending legislative actions in the city. When the expenditure lobbyist ordinance is read in conjunction with the rest of the statutory scheme, it is apparent that those individuals solely engaged in issue advocacy will not be subject to the burden of reporting and disclosure.

Smith also does not cite any specific evidence that the burden of disclosure and reporting would chill political speech and would be overinclusive. In the absence of such evidence we cannot infer that such a burden exists with respect to his facial challenge. Smith argues that the United States Supreme Court's decisions in *McIntyre v. Ohio Elections Comm'n* (1995) 514 U.S. 334, 342 (*McIntyre*), and *Talley v. California* (1960) 362 U.S. 60, 64-65, are instructive as they guarantee that the right to remain anonymous in the advocacy of political issues is an aspect of First Amendment rights that must be protected. In *McIntyre*, the Supreme Court, following its similar decision in *Talley* regarding an ordinance in California, held that an Ohio law prohibiting anonymous leafleting was unconstitutional. (*McIntyre*, *supra*, at p. 357.) In contrast, anonymous leafleting under the San Jose Municipal Code is permitted and no disclosure is required, as those engaged solely in the publication of such materials will not be subject to the expenditure lobbyist disclosure requirements given the exemption provided in SJMC section 12.12.020C.

In fact, the *McIntyre* court drew a distinction between the disclosure of an author's name in a handbill and the disclosure of expenditures, the latter of which the court found

19

to be less worthy of constitutional protection. The court reasoned that in contrast to a leaflet's "personally crafted statement of a political viewpoint," which would unmistakably reveal the author's view on a controversial issue, "[d]isclosure of an expenditure and its use, without more, reveals far less information. It may be information that a person prefers to keep secret, and undoubtedly it often gives away something about the spender's political views. Nonetheless, even though money may 'talk,' its speech is less specific, less personal, and less provocative than a handbill--and as a result, when money supports an unpopular viewpoint it is less likely to precipitate retaliation." (*McIntyre*, *supra*, 514 U.S. at p. 355.) The ordinances in question here similarly only require disclosure of the expenditure of money, and do not require the explicit identification of handbills or leaflets.

Smith maintains that the expenditure lobbyist ordinance is overinclusive as it fails to "clearly mark the boundary between the permissible discussion of issues and invitation to contact others about those issues" given the ordinance's definition. Expenditure lobbyists are defined in the SJMC as those individuals who incur more than $5,000 in expenses during any calendar year in connection with carrying out advertising, public relations, or similar activities, with the intent to either directly or indirectly urge others to contact city officials. (SJMC, § 12.12.180C.) We fail to see how the wording of the ordinance on its face suggests an overinclusive nature. The ordinance states that those who engage in the public discourse regarding an issue, or publicly invite others to contact city officials about certain topics, are exempt from the disclosure requirements of the expenditure lobbyist ordinance. It is only when an individual creates advertising or engages in public relations activity, and spends more than $5,000 in a year on such activity, is he or she they then subject to the disclosure and reporting requirements set forth under the SJMC.

20

Smith then contends that the expenditure lobbyist ordinance is "underinclusive," as it exempts certain types of people from the registration and disclosure requirements without "any rationale for doing so." A list of exemptions from the registration requirements is located at SJMC section 12.12.020. Smith cites *City of Ladue v. Gilleo* (1994) 512 U.S. 43 and *First National Bank of Boston v. Bellotti* (1978) 435 U.S. 765, 785 for the proposition that "an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.' " (*City of Ladue v. Gilleo*, *supra*, at p. 51.) Smith also cites *Brown v. Entm't Merchs. Ass'n* (2011) 131 S.Ct. 2729 [2011 U.S. LEXIS 4802], arguing that "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." (*Id*. at p. 2740.) The cases Smith relies on for his argument on underinclusiveness do not support his position.

*City of Ladue v. Gilleo* concerned a city ordinance prohibiting homeowners from displaying *any* signs on their property except for " 'residence identification' " signs, " 'for sale' " signs, and signs warning of safety hazards. (*City of Ladue v. Gilleo*, *supra*, 512 U.S. at p. 45.) *First National Bank of Boston v. Bellotti* considered the constitutionality of a state criminal statute forbidding banks and business corporations from making expenditures for the purpose of influencing votes on referendum proposals. (*First National Bank of Boston v. Bellotti*, *supra*, 435 U.S. at p. 768.) *Brown v. Entertainment Merchants Ass'n* addressed a California law restricting the sale of violent video games to minors. (*Brown v. Entertainment Merchants Ass'n*, *supra*, 131 S.Ct. at p. 2740.) There the Supreme Court determined that California had "singled out the purveyors of video games for disfavored treatment--at least when compared to booksellers, cartoonists, and movie producers--and has given no persuasive reason why." (*Ibid*.)

21

Unlike the laws and ordinances at issue in the aforementioned cases, the City's expenditure lobbyist ordinance does not prohibit certain categories of individuals from advocating their views. The expenditure lobbyist ordinance is a burden on speech, such that an individual who meets the definition of "lobbyist" and who is not otherwise exempted must register. This is unlike a law prohibiting homeowners from displaying certain signs, prohibiting businesses and corporations from making expenditures, or prohibiting the sale of certain goods to minors. In short, the expenditure lobbyist ordinance does not create a barrier against certain types of speech. It creates a burden on certain individuals who meet the requirements set forth in the ordinance to register and disclose their lobbying activity.

Smith claims that the City has exempted certain individuals from the burden of registration without any rationale for doing so. Certainly, as case law has shown, an underinclusive statute may be found unconstitutional. However, a regulation is "not fatally underinclusive simply because an alternative regulation, which would restrict *more* speech or the speech of *more* people, could be more effective. The First Amendment does not require the government to curtail as much speech as may conceivably serve its goals." (*Blount v. S.E.C.* (D.C. Cir. 1995) 61 F.3d 938, 946.) The underinclusive analysis is primarily concerned with ensuring that " 'the proffered state interest actually underlies the law,' [citation], a rule is struck for *under*inclusiveness only if it cannot 'fairly be said to advance any genuinely substantial governmental interest' [citation], because it provides only 'ineffective or remote' support for the asserted goals." (*Ibid.*) Smith does not proffer concrete arguments as to why the exemptions provided in the SJMC frustrate the goals of the expenditure lobbyist ordinance, which are to inform the public and provide transparency. It is possible that the ordinance could provide for fewer exemptions and therefore require registration for more individuals. However, simply because this stricter registration requirement is *possible* does not mean that the

22

ordinances as they currently stand are facially unconstitutional.  There is a valid government interest in requiring registration and disclosure of expenditure lobbyists, as noted earlier.  Such a government interest is not completely overridden by the existing exemptions, rendering the ordinance ineffectual.

We therefore find that the expenditure lobbyist ordinance supports the legitimate government interest in disclosure to the electorate, and that it imposes only modest burdens on an individual's First Amendment rights.  The ordinance only dictates that lobbyists must disclose expenditures, and as a result, it survives exacting scrutiny.  However, in reaching this conclusion we do not mean to imply that the statute would be impervious to narrower as-applied challenges.  (See *Doe*, *supra*, 130 S.Ct. 2811, 2821.)  Our conclusion is based solely on Smith's broad facial challenge to the ordinance.

C. *The Expenditure Lobbyist Ordinance is not Overbroad*

Smith also argues that the expenditure lobbyist ordinance is unconstitutional because it is overbroad and is not subject to a narrowing construction.  Smith claims that the expenditure lobbyist ordinance has a real deterrent effect on legitimate political expression.

Constitutional challenges to statutes based on overbreadth with respect to free speech will prevail if it is shown that the law inhibits an individual's First Amendment rights and is not subject to a narrowing construction.  (*Broadrick v. Oklahoma* (1973) 413 U.S. 601, 611-613; *Erznoznik v. City of Jacksonville* (1975) 422 U.S. 205, 216.)  Smith's challenge to the expenditure lobbyist ordinance, however, does not adequately address the first prong of the overbreadth analysis, as Smith does not demonstrate how the expenditure lobbyist ordinance on its face chills the exercise of political speech.

Smith argues that the deterrent effect of the ordinance is "real and substantial," and he points out that "not a single member of the public has ever registered as an expenditure lobbyist."  However, the fact that no member of the public has registered as

23

an expenditure lobbyist is not evidence of a deterrent effect, nor is it evidence of a lack of a deterrent effect. Any deductions we would make from this lack of registrants would be solely hypothetical.

Smith insists that Government Code section 86115, a section of the Government Code similar to the expenditure lobbyist regulation, is not sufficiently similar to the SJMC expenditure lobbyist ordinance, and therefore fails to provide clarity or justification of the City's ordinance. Government Code section 86115, subdivision (b), provides that "[a]ny person who directly or indirectly makes payments to influence legislative or administrative action of five thousand dollars ($5,000) or more in value in any calendar quarter, unless all of the payments are of the type described in subdivision (c) of Section 82045" must file statements pursuant to Government Code section 86116. Government Code section 86116 sets forth requirements that individuals subject to the code section file periodic reports as to their expenditures on lobbying activities. Government Code section 82045 specifies that a "payment to influence legislative or administrative action" includes a "[p]ayment for or in connection with soliciting or urging other persons to enter into direct communication with any elective state official, legislative official or agency official." (*Id.*, § 82045, subd. (e).)

Smith argues that the trial court failed to acknowledge that the City's expenditure lobbyist ordinance is distinct from the state's respective statute as the expenditure lobbyist ordinance at issue here has a lower monetary threshold at $5,000 per year, compared to the state's threshold of $5,000 per calendar quarter. We recognize that there is a difference between the thresholds required for registration under the SJMC ordinance and the similarly worded Government Code section. Nonetheless, Smith fails to demonstrate how the lower threshold burdens First Amendment rights. Disclosure and registration laws are dissimilar to prohibitions on speech. Functionally, the expenditure ordinance does not mandate that people may not speak out on a certain issue, or that they

24

cannot spend as much of their own resources as they wish on speaking out about a particular cause.  The disclosure and registration requirements only impose a burden on individuals who meet the criteria set forth in the ordinance.

We therefore conclude that the expenditure lobbyist ordinance is not unconstitutionally overbroad.

D. *The Expenditure Lobbyist Ordinance is not Unconstitutionally Vague*[8]

Smith also contends that the ordinance's language is ambiguous and confusing, as it defines expenditure lobbyists as those who intentionally, either directly or indirectly, solicit or urge others to communicate with city officials.  Smith specifically finds fault with the statute's lack of definition as to what would constitute an "indirect" solicitation to urge others to communicate with a city official.

" 'A law is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement.' [Citations.]  'Nevertheless, perfect clarity is not required even when a law regulates protected speech,' [citation], and 'we can never expect mathematical certainty from our language.' " (*Human Life of Washington*, *supra*, 624 F.3d at p. 1019.)  As the United States Supreme Court has explained, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.' " (*Hill v. Colorado* (2000) 530 U.S. 703, 733 (*Hill*).)  Additionally, "

---

[8] Smith argues in part that the expenditure lobbyist ordinance is overbroad.  He also contends that the ordinance is unclear as it does not sufficiently define what would constitute an "indirect" action to urge others to communicate with city officials.  We find that this argument is best interpreted as a facial vagueness challenge to the expenditure lobbyist ordinance.  Vagueness and overbreadth have been traditionally seen as "logically related" "similar." (*Kolender v. Lawson* (1983) 461 U.S. 352, 358, fn. 8.)  For clarity, we address Smith's vagueness arguments separately.

25

'otherwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity,' [citation], and vagueness challenges will be rejected when it is 'clear what the ordinance as a whole prohibits.' " (*Human Life of Washington*, *supra*, at p. 1021.)

The ordinance defines an expenditure lobbyist is one who, through public relations, advertising, or similar activities, spends more than $5,000 in a calendar year with the *intent* to solicit or urge, either directly or indirectly, others to communicate directly with any city official in order to influence a legislative or administrative action. Smith speculates as to the vagueness of the ordinance as written based on hypothetical situations not presented before us, and does not proffer any evidence to substantiate his assertion that the statute is invalid in the majority of circumstances. Viewed as a whole, the expenditure lobbyist definition contains language that limits its application, and provides a clear representation of what conduct the ordinance is meant to cover: those who intentionally, through public relations, advertising, or similar activity, urge others to directly communicate with city officials in order to influence a pending legislative or administrative action. The regulation requires "intent" on the part of the speaker, thereby limiting whatever vagueness exists due to the inclusion of the term "indirectly."

We therefore do not find that the ordinance would be impermissibly vague as applied to the vast majority of cases, given the limiting definition as provided by the requirement that the expenditure lobbyist "intend" to solicit others.

II.     *The In-House Lobbyist Ordinance is Constitutional*

Smith also challenges the constitutionality of San Jose's ordinance regulating and requiring disclosure and registration of in-house lobbyists. Parallel to his arguments regarding the constitutionality of the expenditure lobbyist ordinances, Smith argues that the in-house lobbyist ordinance violates the First Amendment and does not survive

exacting scrutiny, and that the ordinance is unconstitutionally overbroad and vague. We address each of these arguments in turn.

### A. *The In-House Lobbyist Ordinance Survives Exacting Scrutiny*

As with our review of the expenditure lobbyist ordinance, we apply an exacting scrutiny review to the in-house lobbyist ordinance. Therefore, the in-house lobbyist ordinance must bear a substantial relationship to a sufficiently important government interest. (*Human Life of Washington*, *supra*, 624 F.3d at p. 1008.)

#### 1. *Vital Government Interest*

The government interest with respect to disclosure and registration for in-house lobbyists is the same interest as we discussed in the prior section addressing the expenditure lobbyist ordinances. As discussed in *Harriss* and *FPPC*, the government has a vested interest in providing transparency to the electorate and in determining who seeks to influence legislation. (*Harriss*, *supra*, 347 U.S. at pp. 625-626; *FPPC*, *supra*, 25 Cal.3d at p. 47.) We reject Smith's argument that there is no vital government interest in disclosure with respect to private individuals, in contrast to paid lobbyists.

#### 2. *The In-House Lobbyist Ordinance is Sufficiently Related*

Smith argues that the in-house lobbyist ordinance is not sufficiently related to the government's interest in disclosure because the threshold limit for disclosure and registering for in-house lobbyists, 10 hours or more in a consecutive 12-month period, is too low. Smith opines that other municipalities have similar ordinances that require higher hour thresholds prior to registration. For example, Smith points to a local Sacramento ordinance that requires registration for its equivalent of an in-house lobbyist if the individual spends 100 hours or more lobbying in a three-month period.

Smith contends that there can be no legitimate interest in de minimis lobbying efforts undertaken by uncompensated individuals. However, as we discussed earlier, the disclosure and registration requirements for lobbyists *are* substantially related to a vital

27

government interest.  The issue here is whether the disclosure and registration requirement imposed on those individuals who spend more than *10 hours* in a year on lobbying activity is substantially related to the vital government interest of disclosure and electoral transparency.

As discussed by the Ninth Circuit in *Canyon Ferry Baptist Church*, *E. Helena v. Unsworth* (9th Cir. 2009) 556 F.3d 1021, 1033 (*Canyon Ferry*), the relevant question, as acknowledged by the United States Supreme Court in *Buckley*, is whether the 10-hour threshold mandated by the ordinance is " 'wholly without rationality.' "  *Buckley* involved a statute requiring record-keeping for contributions above $10 and disclosure of monetary contributions above $100.  (*Buckley*, *supra*, 424 U.S. at pp. 82-85.)  The *Buckley* court noted in its decision that thresholds created by laws were "necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion."  (*Id*. at p. 83.)  The court thereafter concluded that these limits were not "wholly without rationality" despite little evidence in the relevant legislative history that would "indicate that Congress focused carefully on the appropriate level at which to require recording and disclosure."  (*Ibid*.)

In *Canyon Ferry*, the Ninth Circuit utilized the *Buckley* court's rationale in deciding whether a Montana statute that required political committees to disclose *any* in-kind contributions made toward candidates and ballot issues violated First Amendment rights.  (*Canyon Ferry*, *supra*, 556 F.3d at pp. 1031-1033.)  The Montana statute contained no threshold limit, and was applied to a church's de minimis expenses, including the minimal expenses associated with photocopying fliers and displaying a movie, with respect to a ballot initiative on marriage.  (*Id*. at pp. 1024-1025.)  The Ninth Circuit applied the *Buckley* " 'wholly without rationality' " test, and concluded that *as applied* to the church's expenditures, the statute was unconstitutional.  (*Id*. at p. 1033.)  However, in coming to its conclusion the court limited its holding to the application of

28

the Montana statute to the in-kind contributions made by the church, and it expressed the view that it was "not concerned with--and express[ed] no view about--the constitutionality of Montana's disclosure requirements in the context of candidate elections or as applied to monetary contributions of any size." (*Id*. at p. 1034.) Furthermore, the court explained that it did not "purport to establish a level above *de minimis* at which a disclosure requirement for in-kind expenditures for ballot issues passes constitutional muster," as determining such a threshold is "for the Montana authorities in the first instance." (*Ibid*.)

We find the rationale used by the Ninth Circuit in *Canyon Ferry* and the standard set by the Supreme Court in *Buckley* applicable to this instant case. Smith's argument that the threshold of 10 hours is impermissibly low and infringes upon constitutionally guaranteed rights is one that we cannot resolve. We cannot say that the 10 hour threshold is " 'wholly without rationality' " with respect to the City's interest in knowing who seeks to influence legislative action within the municipality. Perhaps there is a threshold where it may be impermissible, but we cannot invalidate the ordinance based on Smith's broad facial attack. The *Canyon Ferry* court based its determination that the statute was constitutional *as applied* to the church's de minimis activities, but declined to find some sort of universal limit or threshold with respect to other in-kind contributions.

We therefore follow the same rationale advanced by the Ninth Circuit, and conclude that the in-house lobbyist ordinance is sufficiently related to a vital government interest, and survives exacting scrutiny analysis.

B. *Vagueness and Overbreadth in the First Amendment Context*

Next, Smith contends that the City's in-house lobbyist ordinance is unconstitutionally vague and overbroad, in part stemming from what Smith contends is its grammatically incomprehensible structure. SJMC section 12.12.180B defines an in-house lobbyist as "Any person, including a business, corporation, association, political

29

action committee, or any other organization if its owners, officers, or employees have engaged in lobbying activity on its behalf and whose aggregate time engaging in lobbying activity total [*sic*] ten (10) hours or more in a consecutive twelve (12) month period."

Smith cites several grammatical deficiencies with the wording of the ordinance. First, he claims that structurally, the ordinance reads as "[a]ny persons, including [persons]." Second, Smith argues that the parenthetical expression starting with the word "including" is not closed, leading to ambiguity to whether the parenthetical should be closed off after "organization" or "behalf." Third, Smith contends that it is not clear whether the phrase beginning with "aggregate time" modifies "person" or "owners, officers, or employees."

As previously discussed, the standard of review for unconstitutional vagueness challenges is whether the ordinance is so vague such that it is not reasonable to know what conduct is permitted or prohibited. (*Human Life of Washington*, *supra*, 624 F.3d at p. 1019.) Furthermore, if an ordinance or statute is valid in the majority of its intended applications, an ordinance or statute will survive a facial vagueness attack. (*Hill*, *supra*, 530 U.S. at p. 733.) Additionally, " 'otherwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity,' [citation], and vagueness challenges will be rejected when it is 'clear what the ordinance as a whole prohibits.' " (*Human Life of Washington*, *supra*, at p. 1021.) Given our reading of the ordinances discussing in-house lobbyists within the SJMC, we find that Smith's challenge fails. As discussed previously, "the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.' " (*Chicago v. Morales* (1999) 527 U.S. 41, 52.) With respect to vagueness and overbreadth in the context of due process, an enactment can be

30

deemed unconstitutional if it is impermissibly vague rendering the public unable to "guard against the arbitrary deprivation of liberty interests." (*Ibid.*)

Preliminarily, Smith's argument that the parenthetical expression after "including" is not closed and therefore leads to ambiguity is flawed. It is apparent that the parenthetical expression should be closed after "organization," and not after the word "behalf." The placement of the conjunction "and" indicates that there are at least *two* requirements to being an in-house lobbyist. The first is that the in-house lobbyist is any person, including a business or some organization, whose employees or officers have engaged in lobbying activity. The second is that the aggregate amount of lobbying activity undertaken must total more than 10 hours in a 12-month period. If we utilized Smith's interpretation and closed the parenthetical expression after "behalf," we would be left with an incomprehensible statement that would essentially read: "[a]ny person, including [organizations], and whose aggregate time engaging in lobbying activity total ten (10) hours or more in a consecutive twelve (12) month period."

It seems clear that the phrase "if its owners, officers, or employees have engaged in lobbying activity on its behalf" is meant to modify the earlier string of "[a]ny person, including a business, corporation, association, political action committee, or any other organization," not just the word "person." After the words "any person," the SJMC ordinance continues with "including," which indicates that the definition of "person" relevant to the in-house lobbyist ordinance *includes* the string of "business, corporation, association, political action committee, or any other organization." As a result, a modification of the word "any person" would therefore be applicable to the corresponding string of nouns.

A commonsense reading of the ordinances governing in-house lobbyists and their registration requirements demonstrates their collective meaning: businesses entities or similar organizations are required to register if their employees, owners, or officers

31

engage in an aggregate amount of at least 10 hours of lobbying activity per 12-month period. Smith's assertion that the ordinance would require individuals who spend more than 10 hours in a calendar year writing letters to a city official is unavailing. Smith is correct in that the ordinance defines an "in-house lobbyist" as "any person." However, "any person" is qualified as including "any person" if its "owners, officers, or employees" have engaged in an aggregate amount of at least 10 hours of lobbying activity. An individual person writing letters to a city official does not have any "owners, officers, or employees." The intent of the City to limit the application of the in-house lobbyist ordinance to *entities*, not simply *individuals*, is therefore evident in the language of the ordinance itself.

This intent is further clarified in the deposition of Flora Lee Price, who was designated as the "person most knowledgeable" with respect to the City's lobbying ordinances. Price has held the position of city clerk for the City of San Jose since May 2004. During a deposition, Smith's attorney asked Price a simple scenario: if an organization had two employees, each of whom engaged in six hours of lobbying activity, would all three (the organization and the two employees) be required to register as in-house lobbyists under the ordinance? Price answered that only the organization would need to register, listing the individuals. Price's answer is bolstered by information on the City of San Jose's official Web site, which was attached to Price's declaration in support of the City's reply to Smith's opposition to the City's motion for summary judgment.

The City maintains a Web site, published by the "Office of the City Clerk," which includes a "Frequently Asked Questions" page used to assist in the implementation of the lobbying ordinances. In one section, there is a question that states: "Who Qualifies as a Lobbyist?" With respect to in-house lobbyists, the web page explains that an in-house lobbyist is "an entity including a sole proprietorship whose owners, officers, and

32

employees are compensated by the entity to engage in lobbying activity on its behalf and whose collective time totals ten (10) hours or more in any consecutive twelve (12) month period. An owner is deemed to be compensated based on his or her financial interest in the entity."

Smith's hypothetical situation, that an individual who spends more than 10 hours of his or her time writing to a city official would qualify as an in-house lobbyist, is therefore unavailing and contrary to the language and intent of the ordinance itself. An individual would not qualify as an in-house lobbyist under Smith's hypothetical situation because he or she would not be lobbying on behalf of an organization or entity, a requirement that is written into the ordinance.[9]

Smith similarly advances another hypothetical situation, in which he argues that it appears that an employee who spends one hour writing a letter to a newspaper or a city official would therefore be required to register as an in-house lobbyist if the employee's coworker also spends nine hours or more engaged in lobbying activity. Again, this imagined scenario would not trigger the requirement to register as an in-house lobbyist. The employee Smith references is not an entity with owners, officers, or employees, and the time the employee spent on writing the letter to the newspaper or city official would not count toward the aggregate 10-hour threshold for registration unless the letter constituted lobbying activity on *behalf* of the entity or organization. Further, as we

_____

[9] Smith also characterizes the exemption for publication or broadcasting of news items and editorials as an exemption aimed at journalists. However, the wording of the exemption does not preclude ordinary citizens. Smith additionally argues that the availability of the "journalist exemption" is not obvious from a reading of the in-house lobbyist definition, because one would have to cross-reference the definition of "lobbying activity" with the definition of "influencing" and with the exemptions provided in the municipal code. However, Smith does not cite to any authority for the proposition that the structure of the municipal code can somehow render the exemptions unconstitutionally vague. Many different codes are structured such that there are specific sections for definitions and exemptions.

33

previously noted, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.' " (*Hill*, *supra*, 530 U.S. at p. 733.)

Additionally, Smith's argument that the ordinance is vague in part because of its exemption for business owners is unsupported. Under the SJMC, certain business owners are excluded from registration as an in-house lobbyist. SJMC section 12.12.020 provides a list of exemptions from the registration requirements. Included in the list is an exemption for certain business owners whose attempts to influence governmental action are on behalf of the business, and if (1) "[t]he owner or business has not made or solicited contributions for the elected official contacted, or a candidate or independent expenditure committee at the behest of the elected official contacted, in an amount over one thousand dollars ($1,000.00) within the last twelve (12) months in a City election," (*id*., D ¶ 1) (2) "[t]he owner or business has not retained a person to engage in lobbying activity on behalf of the owner or business," (*id*., ¶ 2) or (3) "[o]fficers or employees of the business have not engaged in lobbying activity on behalf of the owner or business." (*Id*., ¶ 3.) An "owner" under SJMC section 12.12.020 is defined as any individual who has greater than a 50 percent interest in the business.

Smith claims that the "no contribution" exception chills business owners from making political contributions. Smith also claims that the exemptions provided to business owners do not narrowly construe the ordinance in such a manner that the ordinance would therefore pass constitutional muster. As discussed *ante*, the in-house lobbyist ordinance does not prohibit lobbying. It only requires disclosure and registration. Business owners are not forbidden from lobbying city officials. Smith further contends that the exemption's definition of an "owner" as someone who owns 50 percent or greater of a business is arbitrary, meaning that any individual who owns exactly 50 percent of a business would never qualify as an "owner" under the exemption.

However, Smith does not proffer any specific arguments or point to any case law that would support his proposition that the exemptions somehow render the ordinance unconstitutional or infirm.

We can see that there are ways in which SJMC section 12.12.180B may have benefited from more precise punctuation or word choice. Nonetheless, we find that as a whole the ordinances are not so vague and inscrutable to render the definitions within meaningless or overbroad. "[P]erfect clarity is not required even when a law regulates protected speech." (*California Teachers Ass'n v. State Bd. of Educ.* (9th Cir. 2001) 271 F.3d 1141, 1150 (*California Teachers*).) "Condemned to the use of words, we can never expect mathematical certainty from our language." (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 110 (*Grayned*).) Facial vagueness challenges launched within the context of the First Amendment are not adjudicated on the basis of whether *any* amount of speech may be chilled--instead, the appropriate standard is whether a *substantial* amount of legitimate speech may suffer. (*California Teachers*, *supra*, at pp. 1150-1152.)

Here, Smith fails to demonstrate that the requisite substantial amount of protected speech will be impacted by the in-house lobbyist ordinance. As the United States Supreme Court has noted, "[f]acial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.' " (*National Endowment for Arts v. Finley* (1998) 524 U.S. 569, 580.) The in-house lobbyist ordinance, like the expenditure lobbyist ordinance, does not act as a prohibition against those who engage in lobbying activity, and does not serve to create a cap regarding the number of hours one may spend engaged in lobbying activity. The ordinance requires that those engaging in such activity file a registration form with the City, disclosing their lobbying activity, but such a requirement is not a prohibition against political speech. We therefore do not find the in-house lobbyist ordinance to be unconstitutionally overbroad or vague on its face.

III.    *The Anti-Deceit Law*

Lastly, Smith challenges the constitutionality of what he refers to as the City's "anti-deceit ordinance," SJMC section 12.12.500C, which provides that "[n]o person engaged in lobbying activity" may "[i]ntentionally deceive or attempt to deceive a City Official as to any material fact which is pertinent to any pending or proposed legislative or administrative action." (*Id*., § 12.12.500C.)  Smith argues that this ordinance violates an individual's right to free speech as it deters a significant amount of legitimate speech and is not subject to a narrowing construction.[10]  Smith states that the terms "deceit," "attempt," and "material fact," used in the ordinance, are impermissibly vague.

A. ***The Applicability of* United States v. Alvarez**

Preliminarily, the City counters that Smith's arguments are foreclosed by the United States Supreme Court's decision in *United States v. Alvarez* (2012) 132 S.Ct. 2537 [2012 U.S. LEXIS 4879] (plur. opn. of Kennedy, J.) (*Alvarez*), in which a plurality held the Stolen Valor Act of 2005 (18 U.S.C. § 704) to be unconstitutional.  We disagree with the City's assessment of the applicability of *Alvarez*.

The Stolen Valor Act, at the heart of the case in *Alvarez*, provided that those who falsely represent themselves either orally or through writing to have been awarded "any decoration or medal authorized by Congress for the armed forces of the United States . . . shall be fined under this title or imprisoned not more than six months, or both." (18 U.S.C. § 704(a).)  The plurality applied an "exacting scrutiny" analysis to the

---

[10] In his opening brief, Smith asserts that the anti-deceit ordinance violates the Fifth and Fourteenth Amendments of the United States Constitution because it is unconstitutionally vague.  However, in his arguments on the point, Smith does not appear to challenge the ordinance as violative of due process (and hence, Fifth Amendment and Fourteenth Amendment rights).  Rather, Smith appears to argue that the anti-deceit ordinance is vague and overbroad in the context of First Amendment rights, in that it chills a substantial amount of legitimate speech and is not subject to a narrowing construction. (*Broadrick v. Oklahoma*, *supra*, 413 U.S. at p. 613.)

36

constitutionality of the Stolen Valor Act, and ultimately held that the Act infringed upon the right to free speech. (*Alvarez, supra*, 132 S.Ct. at p. 2551.) In coming to its conclusion, the court noted that there were some prohibitions on false speech traditionally upheld as constitutional, such as title 18 United States Code section 1001, the criminal prohibition against false statements made to a government official. (*Alvarez, supra*, at pp. 2545-2546.) The City argues that this assessment by the plurality underscores that false speech, such as the deceit, the anti-deceit ordinance seeks to prohibit, does not receive First Amendment protection. However, to the contrary, in noting the existence and constitutionality of the statutes concerning false speech, the plurality made it clear that these laws did not "establish a principle that all proscriptions of false statements are exempt from exacting First Amendment scrutiny." (*Id*. at p. 2546.)

*Alvarez* did not concern the constitutionality of title 18 United States Code section 1001, which is the federal statute criminalizing a false statement made to a government official. *Alvarez* concerned the constitutionality of the Stolen Valor Act, which the court ruled unconstitutional after finding the Act failed exacting scrutiny. Further, the *Alvarez* court made it clear in its decision on the Stolen Valor Act that though *some* regulation of false speech is considered constitutionally sound, not *all* regulation of false speech is constitutional. We therefore do not find *Alvarez* determinative on whether the City's anti-deceit ordinance passes constitutional muster.

37

B. ***Vagueness and Overbreadth in the First Amendment Context***[11]

We apply the same standards set forth *ante* in the sections discussing the expenditure lobbyist ordinance and in-house lobbyist ordinance with respect to overbreadth and vagueness challenges in the First Amendment context to our review of the anti-deceit ordinance. Namely, in order to prevail on his facial challenge, Smith must show that the law inhibits an individual's First Amendment rights, and the law is not subject to a narrowing construction. (*Broadrick v. Oklahoma*, *supra*, 413 U.S. at pp. 611-613; *Erznoznik v. City of Jacksonville*, *supra*, 422 U.S. at p. 216.)

Our initial inquiry is therefore whether the anti-deceit ordinance significantly chills protected speech. Accordingly, we must first determine whether the targeted speech in question is subject to First Amendment protection. As previously discussed, SJMC section 12.12.500C, prohibits any person engaged in lobbying activity from intentionally deceiving, or attempting to deceive, a city official as to any material fact which is pertinent to any pending or proposed legislative or administrative action.

While the First Amendment grants individuals broad freedoms with respect to speech, the right to free speech is not without limits. A look to our Penal Code and our Civil Code reveals that there are many categories of speech on which we have placed certain limitations. Our justice system has criminalized perjury (Pen. Code, § 118), making a criminal threat (*id*., § 422) and soliciting a bribe (*id*., § 653f). These statutory

---

[11] Smith appears to aggregate his constitutional challenge to the anti-deceit law into one argument concerning vagueness. Nonetheless, our reading of Smith's arguments indicate that he launches two challenges, that the statute is vague with respect to certain terms, and that it is overbroad. Overbreadth and vagueness are closely related. Challenges with respect to overbreadth will prevail if it is shown that the law inhibits an individual's First Amendment rights and is not subject to a narrowing construction. (*Broadrick v. Oklahoma*, *supra*, 413 U.S. at pp. 611-613; *Erznoznik v. City of Jacksonville*, *supra*, 422 U.S. at p. 216.) For purposes of clarity, we will address the arguments regarding overbreadth and vagueness separately below.

provisions penalize individuals for their written or spoken words, but each serve an important governmental purpose. Under the Civil Code, we allow individuals to file lawsuits and recover against those who intentionally deceive or defraud, those who defame, and those whose words intentionally inflict emotional distress. This is not to say that all false or hurtful speech fall outside the purview of First Amendment protection. To the contrary, as the plurality in *Alvarez* elucidates in its opinion, the right to free speech does extend protection to some classes of false speech, including, as *Alvarez* concludes, false speech about an individual's possession of a Congressional Medal of Honor. (*Alvarez*, *supra*, 132 S.Ct. at p. 2551.)

Here, the speech at issue is targeted and narrow. Unlike the Stolen Valor Act, the anti-deceit ordinance does not prohibit a certain type of false statement regardless of its setting, whether it is taken in the context of a personal conversation or whether it is uttered within the public domain. The anti-deceit ordinance prohibits only deceit of a city official as to a material fact pertinent to a pending or proposed legislative or administrative action, and only by those engaged in lobbying activity. The anti-deceit ordinance on its face is narrowed thrice: first with respect to the speaker to whom it is applicable (someone engaged in lobbying activity), second with respect to the content of the speech in question (material facts pertinent to a pending or proposed legislative or administrative action), and lastly with respect to the recipient of the speech (a city official). Further, the ordinance plainly articulates that the speaker must have the *intention* to deceive the city official. This means the speaker must know the false nature of the statement he or she is making to the city official. While false statements certainly do receive some measure of constitutional protection, false statements spoken with the intent to deceive are not necessarily subject to a high level of protection.

The United States Supreme Court has articulated that "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error

39

materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 340.) For this reason, "[u]ntruthful speech, commercial or otherwise, has never been protected for its own sake." (*Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 771.) "Nevertheless, in some instances the First Amendment imposes restraints on lawsuits seeking damages for injurious falsehoods. It does so 'to eliminate the risk of undue self-censorship and the suppression of truthful material' [citation] and thereby to give freedom of expression the ' "breathing space" ' it needs to survive [citations]. Thus, 'some false and misleading statements are entitled to First Amendment protection in the political realm.' " (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 953.)

We do not believe that the false speech targeted by the anti-deceit ordinance is subject to First Amendment protection. As noted in *Alvarez, supra*, 132 S.Ct. at pages 2561 through 2562, title 18 United States Code section 1001 makes it a crime to "knowingly and willfully" make any materially false, fictitious, or fraudulent statements or representations "in 'any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States.' " This bar on false statements is not limited to statements taken under oath. (*Alvarez, supra*, at p. 2561.) Title 18 United States Code section 1001 is analogous in its scope to the anti-deceit ordinance challenged in this appeal. Like section 1001, the anti-deceit ordinance only prohibits intentional deceit to a city official about pending administrative or legislative matters within the City's jurisdiction. This is markedly different from the false statements in *Alvarez*. The false statements in *Alvarez* were deemed to receive constitutional protection, but the statements at issue were broad, as the Stolen Valor Act also prohibited false statements made in private. (*Alvarez, supra*, at p. 2547.) Here, the speech targeted by the anti-deceit ordinance is much narrower in scope.

40

Furthermore, title 18 United States Code section 1001 has survived constitutional scrutiny from federal courts. The Ninth Circuit has previously held that "[t]here is no first amendment protection for furnishing with predatory intent false information to an administrative or adjudicatory body. The first amendment has not been interpreted to preclude liability for false statements. For example, defamatory statements can be made the basis for liability. See *New York Times Co. v. Sullivan*, 376 U.S. 254. [Title 18 United States Code section 1001] imposes criminal penalties for knowingly and willfully concealing or misrepresenting material facts before any department or agency of the United States. Courts uniformly punish perjury. As the Supreme Court stated in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974); 'there is no constitutional value in false statements of fact.' Contrary to defendants' assertions, there is simply no basis to hold that deliberately misrepresenting facts to an administrative body for anticompetitive purposes enjoys blanket first amendment protection." (*Clipper Exxpress v. Rocky Mountain Motor Tariff* (9th Cir. 1982) 690 F.2d 1240, 1261-1262 (*Clipper Exxpress*).)

In *Clipper Exxpress*, the Ninth Circuit discussed whether First Amendment protections extended to false statements made to an administrative or adjudicatory body. The Ninth Circuit considered the *Clipper Exxpress* defendant's contention that if the First Amendment did not extend to such false statements, "robust debate would be chilled." (*Clipper Exxpress*, *supra*, 690 F.2d at p. 1262.) The Ninth Circuit rejected this argument, recognizing that restrictions on false statements and imposition of criminal liability for such falsities may sometimes "hamper debate," but that "this possibility does not require that all such statements be immunized from liability." (*Ibid.*, citing to *New York Times Co. v. Sullivan* (1964) 376 U.S. 254.) However, the Ninth Circuit noted that this may "suggest that a court should adopt a stricter standard of proof, or certain additional elements should be required." (*Clipper Exxpress*, *supra*, at p. 1262.) Nonetheless, the court then concluded that "[r]egardless of the degree of protection which might be found

41

appropriate for protecting defendants' statements from antitrust liability, those limits have been exceeded here. Clipper claims defendants knew the falsity of their statements, and made those statements in a deliberate attempt to mislead a regulatory body. We can conceive of no stricter standard than that satisfied by the facts alleged by Clipper." (*Ibid*.) The court then declined to extend First Amendment protection to the defendants. (*Ibid*.)

We are therefore unconvinced that the speech in question--deliberately false statements made to a city official with regard to a pending legislative or administrative action--is protected under the First Amendment.[12] As cases such as *Clipper Exxpress* illustrate, some false statements are not subject to constitutional protection. This is not to say that all false statements should not be protected, as discussed by the plurality in *Alvarez*. However, unlike the speech at issue in *Alvarez*, the false speech targeted by the anti-deceit ordinance is not private, nor is it broad. The anti-deceit ordinance does not prohibit an individual from speaking falsely at home, and it does not prohibit one from making a false statement about a pending legislative activity to others. Further, the exemption provision located at SJMC section 12.12.020 applies to the anti-deceit ordinance. Meaning, those individuals engaged solely in publication or broadcasting of news items, editorials, or commentary which directly or indirectly urges governmental action are not covered.

Accordingly, we find that the false speech targeted by the anti-deceit ordinance does not warrant blanket constitutional protection. Nonetheless, even if we were to find

---

[12] Smith states that the anti-deceit ordinance would hold ordinary people liable for negligent or innocent misrepresentations to city officials. However, this argument is inapposite to the text of the ordinance, which requires that there be an intent to deceive a city official. (SJMC, § 12.12.500C.) Accordingly, those individuals who innocently or negligently misrepresent material facts to a city official, with no intent to deceive the city official with respect to the fact, would not be violating the ordinance.

that such speech is due constitutional protection, we conclude that the ordinance is not unduly vague as Smith contends. Smith specifically finds faults with some of the terminology used in the ordinance, which he describes as vague.

        1. *Deceit*

First, Smith argues that the City's use of the word "deceit" is vague, and is not subject to a narrowing construction. Smith contends that the City's proffered clarifications, including the definition of deceit located in Civil Code section 1710, Business and Professions Code section 6128, and CALJIC No. 15.26, are flawed and only add confusion as to what "deceit" means. We find that the commonsense meaning of the word "deceit" is sufficient in providing the general public with knowledge of what is prohibited under the anti-deceit ordinance.

An ordinance is unconstitutionally vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "if it authorizes or even encourages arbitrary and discriminatory enforcement." (*Hill*, *supra*, 530 U.S. at p. 732.) "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 794; see also *Grayned*, *supra*, 408 U.S. 104.) As previously discussed, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.' " (*California Teachers*, *supra*, 271 F.3d at p. 1151.)

Furthermore, many different ordinances and laws have survived facial vagueness challenges with flexible terms. For example, *Grayned*, *supra*, 408 U.S. at pages 107 through 114, upheld an ordinance that prohibited " 'any noise or diversion which disturbs or tends to disturb the peace or good order of [a] school session.' " (*Id*. at p. 108.) In *Hill*, *supra*, 530 U.S. at page 732, the United States Supreme Court upheld a statute finding that it applied only to those who " 'knowingly' approaches within eight feet of

43

another, without that person's consent, for the purposes of engaging in oral protest, education, or counseling," after noting that "[t]he likelihood that anyone would not understand any of these common words seems quite remote."  Similarly in *Broadrick*, *supra*, 413 U.S. at page 608, the Supreme Court also noted that though there may be disputes as to what certain terms in the ordinance may mean, such as " 'partisan,' " " 'take part in,' " or " 'affairs of political parties,' " a facial vagueness challenge could not be sustained.  The Ninth Circuit in *California Teachers*, *supra*, 271 F.3d at page 1153 also rejected a facial vagueness challenge after determining that any vagueness stemming from the terms " 'curriculum,' " " 'instruction,' " " 'nearly all,' " and " 'overwhelmingly' " would not chill a substantial amount of legitimate speech.  Similarly, the Ninth Circuit in *Gospel Missions of America v. Los Angeles* (9th Cir. 2005) 419 F.3d 1042, 1047-1048, found that the definitions of "charitable" and "solicitation" survived a facial vagueness challenge.  These cases serve to underscore the idea that ordinances need not be explicit with absolutely no room for interpretation in order to survive a facial vagueness challenge.

In this instance, we find that the word at issue, "deceit," is commonly used and provides people of "ordinary intelligence a reasonable opportunity to know what is prohibited."  (*Grayned*, *supra*, 408 U.S. at p. 108.)  "Deceive," as defined by the Oxford English Dictionary, means "[t]o ensnare; to take unawares by craft or guile; to overcome, overreach, or get the better of by trickery; to beguile or betray into mischief or sin; to mislead," and also means "[t]o cause to believe what is false, to mislead as to a matter of fact, lead into error, impose upon, delude, 'take in.' "  (Oxford English Dict. <http://www.oed.com/view/Entry/48096> [as of Dec. 17, 2013].)  "Deceive," as used in the anti-deceit ordinance, is also further clarified by the ordinance's requirement that the deceit must be *intentional*.  Given the commonsense meaning of intentional deceit, it seems clear that the ordinance is meant to target falsehoods that the speaker *knows* to be

44

false.  The anti-deceit ordinance does not serve, on its face, to punish or restrict individuals from freely speaking their minds with respect to issues or facts they believe to be true, but turn out to be false.  Such an act does not fulfill the ordinance's requirement that there be an *intent* to deceive.

Facial vagueness challenges to an ordinance will fail if "it is 'clear what the ordinance as a whole prohibits.' " (*Human Life of Washington*, *supra*, 624 F.3d at p. 1021.)  We find that the wording of the statute is clear enough in that an ordinary person would know what the ordinance as a whole prohibits.  We reiterate that since we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." (*Grayned*, *supra*, 408 U.S. at p. 110.)  Given the entirety of the ordinance and its related sections, we do not find that the anti-deceit ordinance functions to chill a substantial amount of legitimate political speech.  The target of the anti-deceit ordinance is intentional deceit.  An individual discussing a political issue to a city official would run afoul of this ordinance only if they seek to intentionally deceive the city official while engaged in lobbying activity.  From the language of the ordinance, an honest misrepresentation of facts would not be an "intentional deceit."

Smith is correct that in the proceedings below the City attempted to offer definitions of "deceit" including the statutory definition provided for in Civil Code section 1710.  Civil Code section 1710 defines deceit in four ways, including:  "1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; [¶] 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, [¶] 4. A promise, made without any intention of performing it."  Smith argues that the second definition of "deceit" in Civil Code section 1710, if used in the context of the anti-deceit ordinance, would forbid speech by a

45

lobbyist who believes the fact is true. The second definition of deceit in Civil Code section 1710 is that of negligent misrepresentation. However, Smith's argument fails to take into account the entirety of the ordinance. The ordinance does not broadly prohibit "deceit," but rather forbids *intentional* deceit. Even if we applied the definition of deceit found in Civil Code section 1710, the requirement of *intent* forecloses the hypothetical situation that Smith proffers.

In addition, we do not find merit in Smith's speculative argument that the ordinance itself would also chill the constitutionally protected right to petition. It is true that SJMC section 12.12.170 defines "lobbying activity" as any act undertaken that is meant to influence or attempt to influence a city official. This certainly encompasses constitutionally protected petitioning activity. Nonetheless, the anti-deceit ordinance does not forbid one from engaging in lobbying activity. It does not prohibit individuals from sending a letter to a local official to voice their opinion about a project, even if their opinion is riddled with unintentional falsities and misrepresentations. The anti-deceit ordinance applies only if an individual engaging in such activity does so with the intent to deceive. Intentional deceit of a city official is not protected petitioning activity. We may speculate as to how the application of the anti-deceit ordinance might impact an individual's right to petition in certain circumstances.[13] However, such " 'speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.' " (*Hill*, *supra*, 530 U.S. at p. 733.)

---

[13] As previously noted, the exemption provision, SJMC section 12.12.020, would still apply to the anti-deceit ordinance. Accordingly, those whose activities solely include the publication or dissemination of news items, editorials, and other commentary directly or indirectly urging governmental action are not subject to the anti-deceit ordinance. This exemption provision serves to preclude the ordinance from overreaching and chilling a substantial amount of protected petitioning activity.

### 2. *Attempt*

Next, Smith argues that the ordinance's use of the word "attempt" is unconstitutionally vague.  We find no merit in this contention.  Smith essentially posits that since an "attempt" to deceive is disallowed under the ordinance, the ordinance substantially chills permissible speech.  Smith contends that if one only attempts to deceive a city official, but fails in his or her attempt, no harm has been done to either the legislative or administrative process.  Accordingly, Smith concludes that the inclusion of the word "attempt" is invalid.

For the same reasons that we found the City's use of the word "deceit" appropriate, we find the word "attempt" similarly appropriate.  A commonsense meaning of the word "attempt" makes it clear what the ordinance seeks to control.  As defined in the Oxford English Dictionary, "attempt" means "to try, endeavor, essay."  (Oxford English Dict. <http://www.oed.com/view/Entry/12766> [as of Dec. 17, 2013].)  Furthermore, Smith has not proffered any evidence that would show that an attempt to deceive a city official is somehow less harmful to the legislative or administrative process.  An attempt to deceive a city official can delay official acts, and can cause harm by confusing city officials as to pertinent facts related to pending legislation or administrative actions.

### 3. *Material Fact*

Lastly, Smith contends that the ordinance's use of the phrase "material fact" fails to adequately narrow the anti-deceit ordinance.  We disagree, and find that the common definition of what constitutes a "material fact" is sufficient.  The phrase "material fact" is not uncommon.  In the fraud context, California defines a material fact as a fact that " 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' (Rest.2d Torts, § 538, subd. (2)(a); [citation])."  (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977

47

(*Engalla*).) "In this context, a fact is material . . . 'if there is a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching an investment decision.' Materiality is a question of fact for the jury, 'unless the "fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." ' (*Engalla*, *supra*, 15 Cal.4th at p. 977, quoting Rest.2d Torts, § 538, com. e, p. 82.)" (*Persson v. Smart Inventions*, *Inc.* (2005) 125 Cal.App.4th 1141, 1163, fn. omitted.)

Below, the City cited the definition that a fact is material if " ' "it would be likely to affect the conduct of a reasonable man with reference to the transaction in question." ' " (*Wood v. Kalbaugh* (1974) 39 Cal.App.3d 926, 930.) In the context we are presented with here, we could therefore conclude that a fact would be considered material if it would likely affect the conduct of a reasonable city official with reference to the pending legislative or administrative action. Under this definition, we do not find that the phrase "material fact" is unconstitutionally vague, as a statute is unconstitutionally vague on its face only "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "if it authorizes or even encourages arbitrary and discriminatory enforcement." (*Hill*, *supra*, 530 U.S. at p. 732.) We do not believe that a person of reasonable intelligence would have difficulty discerning what could be considered a "material fact" under the ordinance.

IV. *Conclusion*

The City's ordinances governing expenditure lobbyists and in-house lobbyists, and prohibiting the intentional deceit of city officials are not facially unconstitutional.

## DISPOSITION

The judgment is affirmed. The City of San Jose is entitled to its costs on appeal.

48

———————————————————
            Premo, J.

WE CONCUR:

———————————————————
            Rushing, P.J.

———————————————————
            Elia, J.